Web vs. Rozum et al., number 08-2108, Mr. Epstein. Epstein or Epstein? Epstein. And Mr. Goldberg. Every time I do that, all I can think of is young Frankenstein. I'm not going to play out the piece. One of our colleagues left this from the preceding argument and I just put it back here. Thank you, that's very kind. Maybe they'll realize it and maybe they just want to leave it as a souvenir. No comment. May it please the Court, I'm Jules Epstein, Counsel for Appellant Chris Webb, and with your permission I ask to reserve two minutes. Granted. If the Court please. In this, what was initially a one eyewitness criminal prosecution, trial counsel doubled the evidence against his own client. In this case, it looks to me like what happened here is that counsel saw things going badly and he saw that Harcum had recanted and he thought, look, I don't have much chance to win here and to use my football analogy, I need to see if I can come up with a Hail Mary play and I realize that if Harcum gets on the stand, they're going to go after him, but if he's credible, it may be my only chance. There are respectfully, I think, two flaws in that analysis. And the first one is, I don't think there's any affirmative indicator or objective indicator, Judge Ambrose, that things were going down the tubes. Number two, that would have to be looked at not from a subjective perspective of Mr. Farrell lawyer because the standard in Strickland asks, was the conduct, quote, outside the wide range of professionally competent assistants and whether counsel's function made the adversarial testing process work. This Court, and by this Court I mean the Third Circuit, has spoken repeatedly of the frailties of eyewitness identification. Reading the trial, trial counsel did a not bad job of showing the limited opportunity to observe, the suggestive nature of the ultimate identification that occurred. He had evidence of alibi. He had evidence of good character. But the evidence of the alibi, there was, he never got the tow truck driver to purportedly exist to testify. He never got someone from the gas station, I guess at Broad and Bainbridge to testify. He never produced phone records. I'm not saying he... The receipt for the auto repairs just had the... Understood. ...name written in. Understood. And Ms. Colanzo seems to have been a fairly strong witness. She was a benefits analyst, she was a detailed person, she provides fairly detailed information about the individuals who came into the restaurant that night. I respectfully disagree and vehemently, not that she's a smart, I'm sorry, I have to face this way. Actually, you're looking at Judge Fischer when you're looking at us, even though you're seeing Judge Fischer over there. I have two responses to that. Maybe the first one is, if we look at the description that was provided to the police, it was race, height, and coats. So there is not much of a basis to say, notwithstanding that she's a very bright and articulate lady, that she had this problem in eyewitness cases. She did identify him very shortly after the robbery took place, did she not? Roughly 15 minutes, that's correct. After he had been struck, so he's bleeding from the head, after she's shown the co-defendant, and after she's shown the hat that she said the co-defendant wasn't wearing, but the other fellow was wearing. And the flip side is this. I agree, Judge Ambrose, there are times when the Hail Mary pass is a reasonable decision, but that's also based on an assumption that you fairly weighed the costs and benefits. We have two contentions that trial counsel didn't. Most particularly, he didn't get that this was substantive evidence. It's certainly our position, because when they got to the charge conference at the end, he says, I don't think these statements qualify as being admitted for the truth of the matter asserted, yet it was established well, roughly a decade before this trial, that they were. And a Hail Mary pass is an interesting thing, but at least you throw it to somebody who can receive it. The reason this isn't even a Hail Mary pass is the nature of Harkin's assertion. Scoot did it, but I can't tell you who Scoot is or where to find him. I can't describe him. And indeed, he apparently had said something else, because in his opening counsel said, he's going to tell you Jumpy did it. Now, any parent knows that when you say to a child, who broke the TV? I didn't, Scoot did it. Who's Scoot? I can't tell you, and forgive the acting there, but that's the caliber of what you've called the Hail Mary pass. And so we have to look at not just were this indicator had a fair chance of being credited. We know it couldn't, because on its face, it was, as I posited with that example, something that the average Joe or Mary would scoff at. And what happened as a result? What does the jury hear? Sworn testimony at his guilty plea colloquy that Webb did it. Substantive evidence. Sworn testimony or an assertion, an admission of an agent of his by his lawyer at his sentencing, meaning Harkin's lawyer, we're going to do the right thing. He's going to give a statement against Webb. A line by line reading of his, meaning Harkin's, police interview, where he repeatedly not only named Webb, but gave apparent biographical information. He's from New Jersey, but I know him from here. So much so that the judge at the trial turned to Harkin and said, let me see if I've got this straight. You've named this guy 15 times. This also opened the door to the detective coming in to validate the statement, because Pennsylvania's rules as to what are substantive prior inconsistent statements are broader than the federal rules and include signs, albeit unsworn statements. Let's assume for the moment that Harkin didn't testify. Is there, what did your client have as a possible way of convincing a jury that he might be innocent, other than his own testimony? He had the absence of a gun, because these warrant officers with what I will call politely challenged credibility, both had criminal problems of their own, claimed they saw him throw a gun down, but at that scene nothing was found. There's, as I've already discussed, a suggestive ID. And to make it clear, Harkin was the trigger person, right? Undisputed, but they said both guys had guns and the warrant officers claimed that Webb threw down. But for purposes of guilt or innocence of being involved in the robbery here, which ended up with somebody being shot, if Webb was there, he would still be liable, right? But we're talking about as to a credibility issue of beyond a reasonable doubt, where the police are saying, oh, he must be guilty, we're chasing him, Webb's saying, I'm innocently caught up in this, they're saying, he threw a gun, there's no gun. He's employed, he has evidence of good character, which in Pennsylvania entitles him to a jury instruction that the evidence of good character alone is sufficient to show that the government did not prove its case beyond a reasonable doubt. But going a generic quote. And then what about the hat that was found? I frankly don't remember what Lee said about the hat. And again, we have this problem of how it was shown. In terms of Ms. Collazo, we respectfully suggest that taking her testimony at face value, somebody walks past a window of a restaurant, walks past a window of a restaurant, comes in, is addressed to her, and within seconds she's told, get on the ground, and I don't see much anymore. That's the paradigm that provides a strong basis for an argument of mistaken identification. The rug was pulled out from under that when you now have substantive evidence from a second eyewitness, arguably the most knowledgeable, the co-defendant, the accomplice, the shooter, and that that's the problem. In terms of, I'm sorry, if I may, I wanted to turn to the second issue that we were directed to address, which is, was the Pennsylvania Superior Court's decision either contrary to or unreasonable? Let me just ask you another question. Isn't it clear from the questions that counsel asked Harkin, defense counsel asked Harkin, that defense counsel knew about this statement? Knew about the police statement, yes. The dispute that we have, Judge Roth, and I have to make it crystal clear, he obviously had the signed statement. The second issue about where I talk about unpreparedness or lack of reasonable basis is whether he had obtained and read the guilty plea notes, and as we point out, he said, I don't have those either, or words to that effect. So we're again talking about making a decision without all the tools. Was the substance on one much different than the signed statement? No. The difference is... It looks like on appendix 65 to 72 that he was quite familiar with the signed statement. He's familiar with it. The difference, Judge Ambrose, is that there's a qualitative difference, I suggest to a jury, to hear that the guy said it under oath to a judge. So it's not merely that there were no new details, it's there was a multiplier of reinforcement when the jury hears he said that under oath, and then his lawyer repeated it in his sentencing, and that that's a qualitative difference, albeit admittedly there weren't additional details. We suggest that this is contrary to, and the reason is simple. It seems that there's an agreement between the parties on this point, that weighing deficient performance and prejudice has to be done against the record as a whole, not merely the government's evidence. At page 38 of the appendix, the portion appended to the actual brief of appellant, the Superior Court says, well, look, there's an eyewitness. But there's more, because the Commonwealth appellee theorizes they must have known about all the evidence. Well, if you go back to pages 33, 34, and 35, when the Superior Court writes out what are the facts of this case, they only cite the trial judge's opinion, which only repeats the prosecution case. So there's never a weighing of the harm against the totality of the evidence. That's why we suggest it's contrary to. I have nothing more unless there's a question at this point. Judge Fischer, anything further? No, nothing further. Thank you, then I'll wait for my two minutes. Thank you kindly. Thank you. Mr. Goldwurt. Good afternoon, Your Honors. My name is Joshua Goldwurt, and I represent the Commonwealth of Pennsylvania's official nominal party respondents, the appellees. Keep your voice up just a little. Your Honors, with the exception of the one wrinkle, the Superior Court's unfortunate and obviously conceitedly wrong assumption that counsel called Darren Harcum as a witness without knowing that he previously implicated the appellant as the other robber, this really is a straightforward case. This isn't a- Just time out. Pull that mic just a little closer to you. Let's talk a little slower. Or louder. Well, a little slower and a little louder. This is an AEDPA case, as the appellant's briefs acknowledge, although at the end of the day, I don't think that matters much. Even under de novo review, the claim of ineffective assistance, in our view, clearly fails, given the heavy measure of deference that's necessarily due counsel's judgments under Strickland, even without the additional deference that's due to state courts. Why was it that the Commonwealth made the decision in the end not to have Harcum testify? Pardon me? Why was it that the Commonwealth, in the end, made the decision not to have Harcum testify? I think that the prosecutor adverted to it in his closing arguments, where he said, you know, we could have called him, but, you know, who needs the aggravation? You know, I mean, who needs the pollution? It wasn't necessary. And of course, as I mentioned in my brief, the prosecutor, had the prosecutor felt the need to do so, could have called Harcum as a rebuttal witness, even after the defense had rested, specifically for the purpose of bringing in his prior statement, which if the jury found that he'd made, the jury could have determined was true. But I think the prosecutor just determined that it wasn't necessary and that it wasn't worth, you know, picking a fight with a witness who seemed unwilling to cooperate. How do you distinguish this case from the Tippins case? It seems like someone had made a sworn statement to the police identifying the defendant as the assailant, and then on cross-examination had to admit to that sworn statement. In the Tippins case, which I know is mentioned in the Superior Court's opinion, Tippins truly was a case where the attorney did call the witness without having any idea what he would testify based on what I think was described in the opinion as just a hunch that if the prosecutor didn't call him, then obviously, you know, he assumed that he must be good for the defense, although he had never spoken with him, had no base to know what he would say. And even the trial judge at the time said, I think at a sidebar, I don't know what you were trying to accomplish by doing this, you know, what you even thought that you were trying to accomplish. He just made a totally uneducated guess that this person, if he wasn't going to be testifying for the government, obviously must have had helpful testimony for the defense. In this case, this is different because we know that counsel met with Darren Harcum after realizing he wasn't going to testify, determined what he was going to say. I mean, that is a strategic decision. And his testimony, of course, purported to exonerate the appellant. One of the things that Mr. Epstein noted was that it seems pretty clear when you look at the transcript here that counsel for Mr. Webb had some significant shortcomings. I mean, during the exchange with the court, he had no idea what Rule 408A was. I mean, zero. I don't think that's right, Your Honor. I don't think that's right. I mean, that's a model jury instruction. And I would submit that Commonwealth v. Brady and Commonwealth v. Lively, it would be completely inconceivable for any experienced defense lawyer not to know of those decisions. But in any event. Has this person had much experience with being a defense counsel? It's my understanding that the answer to that is yes. But as I think I pointed out in my brief, there is one line where he asks the judge not to give an instruction. Now, counsel says, well, it's clear under Pennsylvania law that it comes in for substantive evidence. And I cited in my brief the commentary to the model jury instruction in question by the advisory committee. And I know that my opposing counsel is on that advisory committee. And those comments suggest that there is not. You're not going to hold that against him today, are you? Not at all. Not at all, Judge Ambrose. But those comments suggest that there was at least a non-frivolous basis for asking the judge, don't give the instruction. It probably wasn't going to work. The advisory committee comments suggest the majority approach is to say you just look at the procedural regularity about how the statement was made without trying to look past the procedural circumstances. But there was a non-frivolous basis to make the argument. And it cannot be correct that just based on trying to get the judge either to give a jury instruction that you think helps or trying to get the judge not to give a jury instruction that you think doesn't, that that means you were ignorant of the law. The point that Mr. Epstein makes is there was really only one eyewitness who testified. Isn't it reasonable for us to assume that Webb might have fared differently in the absence of Parkham's testimony? Well, I think there are several answers. First, I mean, with regard to the performance component of Strickland, that has to be evaluated from the perspective of counsel at the time. Only counsel was in a position to know how this witness seemed to be coming across to the jury. Only trial counsel had the opportunity to prepare his own client for his own testimony and determine how that would likely play with the jury. And, of course, I mean, from the prosecutor's perspective and I think also from defense counsel's, I mean, what an eyewitness this was. I mean, it is not the case that she just testified that, you know, she saw him for a few seconds walking up and down the street. Her testimony, you know, at length was from before they entered the restaurant, she thought they were casing the restaurant. She was suspicious about the way they were looking at the restaurant, said, testified. I did not think this was just two people. If her suspicion was up and it would seem that she would be quite concentrating on who these people were that she thought were casing the restaurant. That's what she testified. She testified the moment they walked into the restaurant, she said, I had the feeling that something not good was going to happen. And she said, from that point, I decided to try to take everything I could in because she thought, even before it was announced there was a robbery, that her observations were going to be relevant. And that was her testimony. And that was what, in real time, defense counsel, trying this case, had to contend with. You know, it's one thing to argue that eyewitness identifications aren't infallible, but we know, at least in this case, they're not always all wet either. Her identification, her description of where she thought the robbers were going, led directly, within minutes, to the apprehension of the two, including, of course, Darren Harcum, who has the gun and the robbery proceeds and the guest check from the restaurant. And so there's a suggestion that there was no physical evidence in the case. Well, that's not quite correct. We know that her identification led directly to the apprehension of the trigger man, who, of course, was running down the street with the appellant, although, of course, the appellant's argument was, well, not running with him, running from him. But, again, on a freezing cold February night, when there are not a lot of people out in the street, and that was the testimony by the warrant officers, that they were running down the street together, within minutes of the robbery. And, again, although I think it's not necessary, I think that if he had been convicted without calling Darren Harcum as a witness, I think he might very well have a stronger and effective misclaim than the one he now has. I don't think it would be a winning claim, because I believe what the Supreme Court said in Strickland is there are countless ways to provide effective assistance in any given case. But I think it likely would be a stronger claim than the one he had now. I think that argument would start with numerous cases, including cases from this court have recognized that alibis that are supported by little other than the defendant's own say-so and that of his friends and family are not particularly strong, as was noted during the opening argument. It wasn't supported by the tower. There was testimony that he called his fiancée. His fiancée called the uncle. The uncle called the tower. No telephone records were introduced. The gas station was open. No gas station employee testified either that he saw that the appellant push his car, I believe at Cadillac Cooperville, into the gas station parking lot, or saw him try to start the car, or even saw it towed away the next day. In fact, I think during the testimony of the arresting police officer, he testified that he was sitting in a police car at Broad and South Street, waiting for trouble calls on South Street, 300 feet away from Broad and Bainbridge. At the time, the trouble call came when the appellant and Darren Harkin were arrested. I mean, is it impossible that the appellant wouldn't have noticed a police car, when pushing his car, that the police car wouldn't have noticed him, that the police car got into position only a minute after he went by his testimony? So it sounds as if what you're saying is there's plenty of evidence, no matter what happens here. I think that's right, and I think that had he been convicted without calling Darren Harkin as a witness, I think the argument would start with, number one, it wasn't a very strong alibi defense. In fact, it wasn't even an alibi, because an alibi is actually a physical impossibility. It's that the defendant was so far away from where the crime was at the time the crime was committed that he couldn't have committed it. I mean, this is evidence that puts him close enough to the crime that he could have committed it, and it's an attempt to affirmatively explain his whereabouts in obvious close proximity to the robber on this freezing cold night in Philadelphia through a neighborhood that the appellant testified he didn't know very well at all and was concerned about walking through, and yet he decided to go wandering through in search of this friend of his, who also doesn't testify and who isn't quite sure where she lives. All of these points, I think, were made in your brief and done well. Anything else you want to add? I think that as a procedural point, there's an argument in the brief by the appellant that he has established counsels and effectiveness based just on these two small parts of the transcript and therefore is automatically entitled to a new trial. I think that it is clear that... And you dealt with that in your brief as well. I mean, you answered that in your brief, did you not? I think so, but I think the point was a slightly different one, which is just to say that even perceived flaws in the postconviction or postconviction appeals process may be a reason to conduct a different kind of review, but that in and of itself doesn't establish that the petitioner's conviction was obtained in violation of the Constitution. This Court's decision, Hassin v. Zimmerman and Lambert v. Blackwell, the 2004 decision that's reported 387 of the F-3rd, says that habeas relief is available when you have violations of the Constitution that occur at trial or on direct appeal and not for perceived deficits in the postconviction or postconviction appeals process. Thank you, Your Honors. Thank you very much. Mr. Epstein. Thank you. If I may, I begin with the issue of the one eyewitness case, and I respectfully direct this Court to a Third Circuit opinion, Thomas v. Varner, cited at page 26 in our initial brief, which said where the prosecution evidence is, in essence, only one identification witness, the exclusion of any other identifying evidence leaves a record where the chances of acquittal are better than negligible. I suggest that that same calculus applies here. I respectfully ask the Court that if you look in the appendix at pages 164 through 179, that's the testimony of Ms. Collazo, and it's a limited opportunity to observe as affirmed by her description, because as you point out, or if I understood the thrust of the Court's question, you can't have it both ways. If you're looking, it should be more than race and height and coats. It's a scary situation. We know about the phenomenon of weapons focus. She admitted the gun was pointed at her. I respectfully disagree with the District Attorney that we'd be arguing the other side. Sure, obviously someone could make any claim, as was pointed out in the last argument that we heard, but the point is would it have merit, and the answer is there are objective indicators that it wouldn't be reasonable to call Harcum because of all this impeachment material. If we buy that argument, then there's never an effectiveness, because there's always, you could say, well, they'd argue the opposite. I suggest that's no argument at all. My last point goes to the comment from Judge Fisher about how articulate a witness this was. So too was Jennifer Thompson. She was the lady in the Ronald Cotton, one of the DNA cases. It was a rape. It was much longer, very articulate, 100% wrong, and she gave more details than Ms. Collazo. Was that the story on 60 Minutes? Most recently she was interviewed. She's now talking about her book called Picking Cotton. That's correct, Judge Ambrose. I'm done. Thank you very much. Thank you kindly. Thank you to both counsels for well-presented arguments. We'll take the matter under advisement.